UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WISCONSIN STATE SENATE,
ANDRÉ JACQUE, and
ANTHONY THEISEN,

           Plaintiffs,

       v.                                Case No. 23-C-1175

CITY OF GREEN BAY and
ERIC GENRICH,

           Defendants.

## DECISION AND ORDER PARTIALLY GRANTING
## DEFENDANTS' MOTION TO DISMISS

The Wisconsin State Senate, Senator André Jacque, and Anthony Theisen (Plaintiffs) originally filed this lawsuit against the City of Green Bay and Green Bay Mayor Eric Genrich (Defendants) in Brown County Circuit Court claiming that Defendants violated their rights under the Wisconsin Electronic Surveillance Control Law (WESCL), Wis. Stat. § 968.31; Article I, § 11 of the Wisconsin Constitution; and their statutory right to privacy, under Wis. Stat. § 995.50. Plaintiffs later amended their complaint to add two claims for damages under 42 U.S.C. § 1983, one against only Mayor Genrich in his individual capacity and one against the City and Mayor Genrich in his official capacity, alleging that Defendants' conduct violated their rights under the Fourth Amendment to the United States Constitution, as well. Defendants thereupon removed the action to this court pursuant to 28 U.S.C. § 1441(a). The court has jurisdiction over Plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367. The case is before the court on Defendants' motion to dismiss

the amended complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. For the following reasons, the motion will be partially granted. The Court begins with a summary of the allegations of the Amended Complaint, which are accepted as true in deciding a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ALLEGATIONS CONTAINED IN THE AMENDED COMPLAINT

This case arises out of Mayor Genrich's decision to install sensitive audio surveillance devices in areas of Green Bay City Hall where members of the public and elected officials would sometimes engage in private conversations about civic matters. More specifically, the devices were installed outside the City Clerk's office on the first floor and outside the Common Council's chambers and the Mayor's office on the second floor of City Hall. Am. Compl. ¶¶ 21–23, Dkt. No. 1-2. The installation of the devices took place sometime between Winter 2021 and Summer 2022 at the direction of Mayor Genrich. *Id.* ¶¶ 9, 16. The devices recorded audio continuously while City Hall was open to the public. *Id.* ¶ 34. They were capable of intercepting and recording private conversations, which they did. *Id.* ¶¶ 42–43. Audio recordings were available for review by the Green Bay Police Department, IT personnel employed by the City, the City's legal department, and Mayor Genrich. *Id.* ¶¶ 30–31.

Mayor Genrich did not notify Green Bay's Common Council of his decision to install audio recording devices in City Hall, nor did the Common Council pass any formal ordinance or resolution authorizing their installation at that time. *Id.* ¶ 19. Other than certain unidentified staff members, neither the members of the Council nor members of the public were notified that the audio recording devices were installed and conversations in the corridors of City Hall were being

2

recorded until February 17, 2023. *Id.* ¶¶ 20, 25. This lawsuit was commenced shortly thereafter. *Id.* ¶ 47.

On March 2, 2023, the state court judge then presiding over the case issued a temporary injunction against Defendants ordering them to cease use of the audio recording equipment and that any existing recordings be sealed. *Id.* ¶ 48. On March 7, 2023, the Green Bay Common Council convened a meeting to discuss the propriety of the audio recording devices. *Id.* ¶ 49. At the meeting's conclusion, the Common Council passed an ordinance defining its authority over the use of audio recording technology in City Hall facilities. *Id.* ¶ 53. The Council then voted to remove the audio surveillance devices and to destroy any captured recordings at the conclusion of Plaintiffs' lawsuit. *Id.*

The Wisconsin State Senate is the upper house of the Wisconsin State Legislature. *Id.* ¶ 6. It claims to have an institutional interest in ensuring that municipalities do not act beyond the scope of the authority given to them by the State Legislature. *Id.* Senator André Jacque is the state senator from the 1st Senate District of Wisconsin, encompassing the City of Green Bay. *Id.* ¶ 7. Senator Jacque has been to Green Bay City Hall to discuss sensitive civic matters, has had private and sensitive conversations throughout City Hall, and believes that at least one of his private conversations at City Hall was recorded. *Id.* Anthony Theisen served on the Green Bay Common Council as an elected alderman until 2012. *Id.* ¶ 8. Theisen has been to City Hall since returning to public life to engage in matters of public concern and had at least one sensitive, private conversation regarding the City budget in the hallway, which was recorded without his knowledge. *Id.*

The Amended Complaint seeks damages and declaratory relief on behalf of Theisen and Senator Jacque for violations of Wisconsin's Electronic Surveillance Control Law (WESCL), Wis.

Stat. § 968.31 (Counts I and II), and the Wisconsin Right to Privacy Law, Wis. Stat. § 995.50 (Count III).  The individual Plaintiffs seek only damages under § 1983 for violations of their rights under the Fourth Amendment prohibition of the United States Constitution (Counts IV and V) and only declaratory relief for the alleged violation of their rights under Article I, Section 11 of the Wisconsin Constitution (Count VI).  The State Senate seeks only declaratory relief for violations of the WESCL (Count I) and Article I, Section 11 of the Wisconsin Constitution (Count VI).

## ANALYSIS

### A.  Jurisdictional Challenges

Before turning to the legal sufficiency of the amended complaint, the court must first address the jurisdictional requirements for Plaintiffs to pursue this action.  A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the jurisdiction of this court over the subject matter in the complaint.  Fed. R. Civ. P. 12(b)(1).  To survive a Rule 12(b)(1) motion, the plaintiff must establish that the jurisdictional requirements have been met.  *Schaefer v. Transp. Media, Inc.*, 859 F.2d 1251, 1253 (7th Cir. 1988).  The proponent of federal jurisdiction must "prove those jurisdictional facts by a preponderance of the evidence."  *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

Defendants assert that the State Senate should be dismissed as a party for lack of standing because Plaintiffs do not identify any injury in fact that it suffered or invasion of a legally protected interest.  Article III of the United States Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies" brought by litigants who demonstrate standing.  U.S. Const. art. III, § 2, cl. 1.  The doctrine of standing is not an esoteric doctrine that courts use to avoid difficult decisions; it "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  "The familiar 'triad

4

of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement.'" *Gracia v. SigmaTron Int'l Inc.*, 986 F.3d 1058, 1064 (7th Cir. 2021) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998)). The plaintiff bears the burden of establishing each element. *Id.*

Although Plaintiffs allege in their complaint that the State Senate has an institutional interest in ensuring that municipalities do not act beyond the scope of the authority given to them by the State Legislature, Am. Compl. ¶ 6, they offer no argument in response to Defendants' motion to dismiss. Instead, they contend that the court should simply avoid the question of whether the State Senate has standing since it is undisputed that Theisen and Senator Jacque have standing and the presence of at least one plaintiff with standing satisfies the requirements of Article III. Pls.' Br. in Opp'n at 29–30, Dkt. No. 18 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that the Court need not consider standing of other plaintiffs under Article III when it is clear that at least one will sustain injury)).

However, "[t]he general rule that only one plaintiff needs standing to make an issue justiciable does not strictly prohibit a district court, in a multiple plaintiff case, such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing." *Thiebaut v. Colorado Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011) (internal quotation marks and citation omitted); *see also Access Living of Metro. Chi. v. Uber Techs., Inc.*, 958 F.3d 604, 612 (7th Cir. 2020) (affirming dismissal of a single plaintiff for lack of standing when two other plaintiffs with standing remained in the case). Allowing parties with no standing to continue to participate in the case merely invites confusion and likely increases the time and resources needed to resolve the matter. Defendants should not be required to respond to discovery demands of three separate plaintiffs when only two belong in the case. Especially in cases where prevailing

5

plaintiffs may be entitled to actual costs and attorneys' fees, retaining a plaintiff who lacks standing is an invitation for unnecessary and increased litigation.

This is not to say that the State of Wisconsin does not have an interest in whether its laws prohibiting the unauthorized interception of oral communications are enforced. Indeed, the legislature has made a violation of the WESCL a Class H felony punishable by up to six years in prison and a $10,000 fine. Wis. Stat. §§ 968.31(1); 939.50(3)(h). But the enforcement of the State's criminal laws is the responsibility of the executive branch, not the legislature. Moreover, this is a civil suit seeking damages for injuries allegedly sustained by individuals. The State Senate makes no such claim. Thus, even if it is unnecessary to decide the State Senate's standing for the case to proceed, dismissing the State Senate as a party where it clearly lacks standing will eliminate confusion and streamline the case for more expeditious resolution. The State Senate will therefore be dismissed as a party to the suit for lack of standing.

Defendants also contend that Counts I and VI of the amended complaint, which seek solely declaratory relief, are mooted by the Common Council's intervening action of removing the recording devices from City Hall. "[M]ootness is the doctrine of standing set in a time frame; that is, the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 929 (7th Cir. 2013) (internal quotation marks and citation omitted). "If intervening circumstances deprive the plaintiff of a personal stake in the outcome, 'the action can no longer proceed and must be dismissed as moot.'" *Watkins v. United States Dist. Ct. for the Cent. Dist. of Illinois*, 37 F.4th 453, 457 (7th Cir. 2021) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)).

6

Plaintiffs argue that, despite the Common Council's intervening action to remove the audio recording devices from City Hall, their claims for declaratory relief are not moot because they are predicates to their claims for damages. Upon the Common Council's resolution, Plaintiffs amended their complaint to abandon their request for an injunction. Although there is no question that their request for injunctive relief would now be moot, Plaintiffs contend that their requests for declaratory relief should survive as a predicate for their damage claims. In support of their contention, Plaintiffs cite *Crue v. Aiken*, which held that "[w]hen a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive." 370 F.3d 668, 677–78 (7th Cir. 2004).

The Declaratory Judgment Act (DJA), 28 U.S.C. § 2201, provides that in a case of an "actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration . . . ." 28 U.S.C. § 2201(a). The purpose of declaratory relief is to allow the adjudication of rights and obligations in cases involving an actual controversy but have not yet reached the stage in which a party could sue for coercive relief, such as damages. CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE 4th § 2751, 426–27 (2016). "A court may exercise its discretion to decline to consider an action under the DJA, particularly in cases when another remedy will achieve the same result." *Greenleaf Ltd. P'ship v. Ill. Hous. Dev. Auth.*, No. 08 C 2480, 2013 WL 4782017, at *6 (N.D. Ill. Sept. 6, 2013).

Where, as here, an allegedly aggrieved party has commenced an action for damages for the same violation, any claim for declaratory relief would seem redundant. Implicit in an award of damages is the legal conclusion that the defendant has wronged the plaintiff in the way alleged. "While the availability of another remedy does not preclude declaratory relief, a court may

properly decline to assume jurisdiction in a declaratory action when the other remedy would be more effective or appropriate." *City of Highland Park v. Train*, 519 F.2d 681, 693 (7th Cir. 1975) (citing 6A J. MOORE, FEDERAL PRACTICE § 57.08(3) (2d ed. 1974)). And while *Crue* held that the district court did not abuse its discretion in allowing the claim for declaratory relief to proceed, the court did not hold that it must. 370 F.3d at 677–78.

I conclude that it is appropriate to dismiss Plaintiffs' claims for declaratory relief here. The claims for declaratory relief add nothing to the case other than avenues for additional argument and expenditure of resources. Counts I and VI are therefore dismissed in their entirety, and that portion of Count III seeking declaratory relief is also dismissed.

### B. Sufficiency of the Amended Complaint

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Rule 8 requires a pleading to include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must have factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, he must plead "more than labels and conclusions." *Id.* A simple, "formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570) (internal citations and quotation marks omitted). In evaluating a motion to dismiss, the court must view the plaintiff's factual allegations and any inferences reasonably drawn from

them in a light most favorable to the plaintiff.  *See Yasak v. Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi.*, 357 F.3d 677, 678 (7th Cir. 2004).

Defendants argue that Plaintiffs' case should be dismissed because they fail to allege that they had a reasonable expectation of privacy over their conversations in the hallways of City Hall. Plaintiffs are required to plead a reasonable expectation of privacy as an element of each of their claims.  *See Katz v. United States*, 389 U.S. 347, 353 (1967) (holding that the Fourth Amendment protects individuals from violations of the privacy upon which they justifiably rely); *State v. Floyd*, 2017 WI 78, ¶ 19, 377 Wis. 2d 394, 898 N.W.2d 560 (interpreting Wisconsin's constitutional counterpart coextensively with the United States Supreme Court's interpretation of the Fourth Amendment); *State v. Duchow*, 2008 WI 57, ¶¶ 19–20, 310 Wis. 2d 1, 749 N.W.2d 913 (explaining that WESCL codified and incorporated into the meaning of "oral communication," which the statute protects, the reasonable expectation of privacy standard); *Bogie v. Rosenberg*, 705 F.3d 603, 609–10 (7th Cir. 2013) (interpreting the statutory right to privacy under Wis. Stat. § 995.50 to include a reasonable expectation of privacy).  Thus, if Plaintiffs failed to plausibly allege a reasonable expectation of privacy, their case must be dismissed in its entirety.

To plead a reasonable expectation of privacy under the Fourth Amendment, a plaintiff must allege (1) conduct suggesting that he subjectively sought to preserve something as private and (2) that society recognizes such expectation as reasonable.  *Bond v. United States*, 529 U.S. 334, 338 (2000).  Whether an expectation of privacy was reasonable is a fact-dependent inquiry and must be determined on a case-by-case basis.  *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007).  Courts consider the "layout" and "distinct nature" of the place where conversations happen, as well as "the practical realities of the situation."  *United States v. Webster*, 775 F.3d 897, 905 (7th Cir. 2015).  Moreover, courts engage in a balancing of interests, weighing the societal interest

9

in security and an individual's interest in privacy. *Hudson v. Palmer*, 468 U.S. 517, 527 (1984). Defendants do not dispute Plaintiffs' subjective expectation of privacy. Indeed, Plaintiffs allege that they conducted their conversation at a low volume and away from others, suggesting that they sought to keep their conversations private. Am. Compl. ¶ 75. Instead, Defendants argue that, as a matter of law, Plaintiffs cannot establish that their expectation of privacy in the City Hall's hallways was reasonable.

First, Defendants contend that the need for safety measures at government buildings is "particularly acute." Defs.' Br. in Supp. at 8, Dkt. No. 12 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000)). Accordingly, they argue that searches at the "entrances to courts and other official buildings" have become "routine" and are not the type that society recognizes as unreasonable. *Id.* (citing *Chandler v. Miller*, 520 U.S. 305, 323 (1997)). But such searches are intended to discover and prevent the introduction of dangerous weapons or devices into government buildings, not private discussions that may be held there. A general concern for public safety is not a lawful basis for the continuous and ongoing interception of private conversations under both the Wisconsin and United States Constitutions, as well as under state and federal statutory law. *See* Wis. Stat. § 968.28; 18 U.S.C. § 2511. Authorization to install such a device requires a warrant signed by a judge based on a particularized finding of probable cause to believe a crime was committed or is being committed. *Id.*; *Katz*, 389 U.S. at 356–57. No such warrant was sought or issued here.

The rule requiring the government to obtain a court order before intercepting private conversations is not new. It was established by the Supreme Court more than fifty years ago in *Katz*. *Katz* involved a defendant who was convicted of interstate gambling based in part on evidence of his telephone conversations that FBI agents had intercepted without a warrant using

electronic listening devices they attached to the outside of a phone booth. The issue before the Court was whether the warrantless interception of the defendant's conversations violated the Fourth Amendment. The Government argued, and the lower courts had found, that no violation occurred because there was no physical intrusion of the area occupied by the defendant, i.e., the phone booth. The Court rejected what it characterized as the parties' misleading way of formulating the issue:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls. The petitioner has strenuously argued that the booth was a "constitutionally protected area." The Government has maintained with equal vigor that it was not. But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.

*Katz*, 389 U.S. at 351.

Like Defendants in this case, the Government in *Katz* stressed the fact that the place in which the conversations occurred was open and visible to the public: "The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside." *Id.* at 352. But as the Court noted, "what [the defendant] sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear." *Id.* The Court continued:

> He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.

*Id.*

11

The same would be true of a person in City Hall who retreats to a location in the hallway away from others and, in a low voice, engages in a conversation with a friend or colleague regarding private or sensitive matters. One who engages in such conduct is surely entitled to assume that the words he utters to his friend or colleague in private will not be intercepted by the government.

Plaintiffs also allege that, until questions were raised about the presence of the listening devices in City Hall, there were no signs that warned members of the public that their conversations could be recorded. Am. Compl. ¶¶ 24–25. This fact also cuts against Defendants' argument that installing listening devices in City Hall is analogous to the searches at the entrances to courts and other official buildings that have become routine. Those who enter governmental buildings where entrance is conditioned upon submitting to electronic scanning and/or a search of items one may be carrying know ahead of time that they will be subject to such a search. They are free to avoid entrance or refrain from carrying any personal item that they seek to keep private. The same was not true of the surveillance devices installed by the Mayor.

Mirroring the arguments rejected by the Court in *Katz*, Defendants argue that Plaintiffs had no reasonable expectation of privacy in their conversations because they had no exclusive control over the hallways in City Hall. Defendants contend that the hallways in City Hall are like the public-school classroom, in *Plock v. Board of Education of Freeport School District No. 145*, where the court found that special education teachers had no expectation of privacy that would support a Fourth Amendment claim against the school district. 545 F. Supp. 2d 755, 758 (N.D. Ill. 2007). In *Plock*, the school district decided to install audio/visual recording equipment in special education classrooms in response to allegations of abuse taking place within those classrooms. The audio/visual equipment was to be installed in an open and obvious manner "where

12

the most vulnerable children, both physically and emotionally challenged, were assigned." *Id.* at 756.  Special education teachers assigned to the classrooms where the devices were to be installed brought suit against the board claiming that the installation of the devices violated their rights under the Fourth Amendment and the Illinois Eavesdropping Act.  Upon its conclusion that "[a] classroom is a public space in which government employees communicate with members of the public," and that "[t]here is nothing private about communications which take place in such a setting," the court dismissed the teachers' Fourth Amendment claim and remanded the state law claims to state court.  *Id.* at 758.  Defendants argue that the same reasoning applies here.

This case is readily distinguishable from *Plock*.  In the first place, the teachers in *Plock* were aware that their actions and statements to their students were going to be recorded; the audio/video recording devices were not installed surreptitiously.  *Id.* at 756.  Here, the audio recording devices were not installed in an open and obvious manner, and signs warning the public that their conversations were being recorded were not posted until the presence of the devices was publicly disclosed.  Am Compl. ¶¶ 21–25.  Moreover, parents as well as school officials have a right to know what is going on in a public school classroom, especially one in which vulnerable children are entrusted to the custody and care of teachers.  For these reasons, the court in *Plock* concluded, "Any expectations of privacy concerning communications taking place in special education classrooms such as those subject to the proposed audio monitoring in this case are inherently unreasonable and beyond the protection of the Fourth Amendment."  545 F. Supp. 2d at 758.  The same reasons are not present here.

Defendants also rely on *State v. Duchow* as support for their argument that Plaintiffs had no reasonable expectation of privacy in their conversations in City Hall.  310 Wis. 2d 1, ¶¶ 38–39.  In *Duchow*, a school bus driver's threats to a child were surreptitiously recorded by a voice

recording device that the child's parents placed in his backpack. *Id.* ¶ 1. The Wisconsin Supreme Court held that the bus driver had no reasonable expectation of privacy in threatening statements he made to the student on the school bus. *Id.* ¶ 37. The court reasoned that his statements were "likely to be reported because they [were] threats to injure the person." *Id.* ¶ 29. That the bus driver and student "were the only individuals on the bus [was] of no consequence." *Id.* ¶ 38. The court explained that, despite the fact that bus riders rarely carry tape recorders and that the driver did not speak in a loud voice, the bus driver was never "vested with exclusive control of the school bus, which cuts against his having any reasonable expectation of privacy in the passenger area." *Id.* ¶ 39. And the presence of a recording device was a relatively "minor intrusion on a driver, because society retains a significant interest in ensuring the safety of those traveling on public school buses." *Id.* Defendants argue that, just as in that case, no expectation of privacy should be found here.

Again, the case is easily distinguishable. In *Duchow*, the bus driver's threats were not private. He expected and intended the child to whom he directed his threats to hear them. The child thus did not "intercept" the threat; he was the target of it. The recording of the threat by, or on behalf of, the one who was its target is not the same as a third party's interception of the private conversation of other people. The difference is reflected in the fact that the Wisconsin statute that governs electronic interception of oral communications expressly excludes from its general prohibition interception of oral communication where the interceptor is a party to the communication. Wis. Stat. § 968.31(2)(c). The same is true under the Fourth Amendment. *See United States v. White*, 401 U.S. 745, 749 (1971) ("[H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the

14

authorities."); *see also United States v. Lee*, 359 F.3d 194, 201 (3d Cir. 2004) ("The principle underlying the governing Supreme Court cases is that if a defendant consents to the presence of a person who could testify about a meeting and is willing to reveal what occurs, the defendant relinquishes any legitimate expectation of privacy with respect to anything the testimony could cover."). Unlike threats in a school bus, the allegations of the complaint indicate that the conversations intercepted in City Hall were intended to be private between the parties until they were intercepted by the devices installed at Mayor Genrich's direction and without the knowledge or consent of the citizens whose conversations were recorded.

Lastly, Defendants contend that, even if under some circumstances one may retain a reasonable expectation of privacy over communications in a public space, Plaintiffs' allegations supporting a reasonable expectation of privacy are vague and conclusory. More specifically, Defendants challenge the absence of factual details in Plaintiffs' allegations, including dates, times, the precise locations within the hallways, the number of participants, and the presence of other individuals in the hallways during Plaintiffs' allegedly recorded conversations. They argue that the allegations lack the requisite specificity to suggest that Plaintiffs' conversations were in fact recorded because Plaintiffs fail to allege whether the audio recording devices were able to pick up every conversation in the hallway or that there was no background noise interfering with Plaintiffs' conversations when they were allegedly recorded.

But even if they do not allege the exact dates and times their conversations occurred, or whether other conversations were simultaneously happening that could have interfered with the recording of their conversations, Senator Jacque and Theisen allege sufficient facts to allow the court to draw the reasonable inference that their private conversations were intercepted by the listening devices installed by Mayor Genrich. *See Iqbal*, 556 U.S. at 678. Plaintiffs allege that

their conversations took place in the hallways of City Hall where the audio recordings were installed. Am. Compl. ¶¶ 21–23. They describe the layout of those hallways, which allow for conversations not to be overheard. *Id.* ¶¶ 35–36. They also allege that the devices operated continuously and without notice to the public while City Hall was open. *Id.* ¶¶ 24–25, 29. Thus, drawing all reasonable inferences in favor of Plaintiffs, they plausibly allege facts sufficient to support the existence of a reasonable expectation of privacy in their recorded conversations in City Hall. *See Yasak*, 357 F.3d at 678. The fact that at this stage of the proceedings, before discovery has occurred, Plaintiffs cannot, or decline to, identify the specific conversations they believe were intercepted is not a reason to dismiss their complaint.

### C. Qualified Immunity

Additionally, Defendants argue that Plaintiffs' § 1983 claim against Mayor Genrich in his individual capacity should be dismissed because he is entitled to qualified immunity. Under this doctrine, government officials performing discretionary functions are immune from liability under § 1983 "when [their] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). "[B]ecause immunity may depend on particular facts that a plaintiff need not plead to state a claim[,] . . . dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not state a claim of violation of clearly established law." *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (internal quotation marks and citations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). "This exacting standard gives

government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotation marks and citation omitted). The court must not "define clearly established law at a high level of generality." *Id.* at 613 (citation omitted). "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *Id.*

The doctrine of qualified immunity has come under increasing criticism in recent times. *See, e.g.*, *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting) (fearing the Supreme Court's "one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment" and signaling "that palpably unreasonable conduct will go unpunished"); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 391 (S.D. Miss. 2020) ("Over the decades, however, judges have invented a legal doctrine to protect law enforcement officers from having to face any consequences for wrongdoing. The doctrine is called 'qualified immunity.' In real life it operates like absolute immunity."). Surprisingly, these criticisms have arisen primarily in cases in which law enforcement officers are called upon "to make life and death decisions of constitutional import within a matter of seconds." *Doxtator v. O'Brien*, 540 F. Supp. 3d 815, 832 (E.D. Wis. 2021), *aff'd*, 39 F.4th 852 (7th Cir. 2022). Typically, there is no clear "black letter law" controlling the issue. This is not such a case.

The decision to install listening devices in the hallways of City Hall was not made suddenly under life and death circumstances. There is no suggestion that Mayor Genrich was faced with an emergency that required prompt action on his part without consulting the City's legal department. Plaintiffs allege that the devices were ordered from an electronics manufacturer and installed sometime between the winter of 2021 and the summer of 2022. Am. Compl. ¶¶ 16–17. Nor does

it appear that the legality of such an installation was unclear. According to the Amended Complaint, the decals on the devices explicitly warned that "[w]hen this equipment is used as part of an audio monitoring system, the law requires that the public be given notice of 'AUDIO MONITORING ON THE PREMISES,'" with a specific reference to the federal law requiring such notice. *Id.* ¶ 17. Moreover, federal and state statutes clearly and unequivocally prohibit the unauthorized interception of oral communications. 18 U.S.C. § 2511; Wis. Stat. § 968.31(2).

Defendants rely on "the numerous decisions cited throughout [their brief] as support for their argument that there was no clearly established law barring surveillance in the public hallways of City Hall." Defs.' Br. in Supp. at 12. Having already discussed and distinguished those cases from the facts alleged in this case, it is not necessary to repeat that analysis here. Plaintiffs cite *Narducci v. Moore* to support their contention that a clearly established right existed, articulating a reasonable expectation of privacy in public spaces, such that Mayor Genrich would have been aware that his conduct was unlawful. 572 F.3d 313 (7th Cir. 2009).

In *Narducci*, the mayor of a village and other local officials surreptitiously recorded the phone conversations of employees working for the village's finance department due to a concern that irate residents were threatening the employees. *Id.* at 316. The court held that the employees had a reasonable expectation of privacy in their phone line and could conduct confidential business at work, even if their phone was provided for public purposes and their workplace was crowded. *Id.* at 320–21. Further, the court affirmed the district court's holding that "no reasonable official could have believed that the indiscriminate taping of all phone calls, with no notice to the affected employees, for several years after the complaints and alleged threats had ceased, was reasonably related to the problem justifying the search." *Id.* at 322. Defendants attempt to distinguish this case from *Narducci*, arguing that a reasonable expectation of privacy in an office phone line differs

18

from the alleged reasonable expectation of privacy in conversations that took place in the hallways of City Hall.  Their attempt is unavailing.  If anything, Plaintiffs' claims in this case are more compelling than those in *Narducci*.

*Narducci* involved application of the Fourth Amendment to the interception of phone conversations of government employees by their government employers or supervisors while they were at work using government phones.  In that context, the Supreme Court had noted that "the operational realities of the workplace . . . may make some employees' expectations of privacy unreasonable."  *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  The context in which the secret recordings occurred in this case is entirely different.  This case involves conversations between private citizens on their own time.  Moreover, the ostensible motivation for recording the employees' phone conversations in *Narducci* was concern over threats to employees by irate citizens and the employees' own use of the phone to make personal calls on government time.  572 F.3d at 316.  In this case, Mayor Genrich is alleged to have acted "unilaterally or in collaboration with other departments" in causing the installation of the recording devices, notwithstanding the above-quoted warnings on the devices.  Am. Compl. ¶ 16.

Given the holding in *Narducci*, it appears that a reasonable expectation that conversations conducted in private between citizens in the hallways of City Hall would remain private was clearly established.  Indeed, the right to converse in private without government officials listening in was well established even earlier in *Katz*.  As noted above, the Court made clear in *Katz* that, while "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection, . . . what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  *Katz*, 389 U.S. at 351.  These cases were sufficient to place public officials on notice that surreptitiously recording private

19

conversations, even in an area accessible to the public, violates the Fourth Amendment, and by extension, Wisconsin's statutory and constitutional protections as well. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Thus, because Plaintiffs state a claim for a violation of a clearly established right, their claims will not be dismissed on qualified immunity grounds.

### D.  Monell Claim

Finally, Defendants argue that Plaintiffs' *Monell* claim against the City should be dismissed because their allegations of a violation of their Fourth Amendment rights are conclusory. *See Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). To state a *Monell* claim, Plaintiffs must allege that a municipal policy, widespread practice, or decision caused a constitutional violation. *Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 829 (7th Cir. 2022). "A municipal entity can be liable under section 1983 for constitutional violations only if those violations were brought about by: (1) an express policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by an agent with final policymaking authority." *Id.* Here, it is undisputed that Mayor Genrich had final policymaking authority and that his decision to install audio surveillance devices in the hallways of City Hall caused the alleged constitutional violation. Further, as explained above, Plaintiffs plausibly allege a reasonable expectation of privacy in their conversations, which Defendants allegedly recorded without a warrant. Thus, Plaintiffs have stated a *Monell* claim for the violation of their Fourth Amendment right against unreasonable searches and seizures.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss under Rules 12(b)(1) and 12(b)(6) (Dkt. No. 11) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Defendants' motion

is granted as to the dismissal of Plaintiff Wisconsin State Senate for lack of standing. Counts I and VI are also dismissed in their entirety, as is that portion of Count III seeking declaratory relief. In all other respects, Defendants' motion is denied. The Clerk is directed to set the matter on the court's calendar for a Rule 16 scheduling conference, after which time discovery may proceed. *See* Fed. R. Civ. P. 26(d)(1).

  **SO ORDERED** at Green Bay, Wisconsin this 27th day of February, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
